IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

East Bridge Lofts Property Owners )
Association, Inc.; Creekstone Builders, )
Inc.; and Creekstone SC I, LLC, )
                            )
        Plaintiffs, )
                            )
    vs. )
                            )
Crum & Forster Specialty Insurance )
Company, )
                            )
        Defendant. )
                            )

Civil Action No. 2:14-cv-2567-RMG

**ORDER**

This matter comes before the Court on Plaintiffs East Bridge Lofts Property Owners

Association, Inc. ("the Association"); Creekstone Builders, Inc. ("Creekstone Builders"); and

Creekstone SC I, LLC's ("Creekstone SC") motion for summary judgment on their declaratory

judgment claim (Dkt. No. 130-1), Creekstone SC's motions for summary judgment on its claims

for bad faith (Dkt. No. 128-1) and breach of contract (Dkt. No. 129-1), and Defendant Crum &

Forster Specialty Insurance Company's ("Defendant") motion for summary judgment (Dkt. No.

125). For the reasons explained herein, the Court GRANTS Plaintiffs' motion for summary

judgment on the declaratory judgment claim; GRANTS IN PART and DENIES IN PART

Creekstone SC's motion for summary judgment on its breach of contract claim, and DENIES

Creekstone SC's motion for summary judgment on its bad faith claim. The Court further

DENIES IN PART and GRANTS IN PART Defendant's motion for summary judgment.

## I. BACKGROUND

This case arises from a commercial general liability ("CGL") coverage dispute between

Creekstone Builders, Creekstone SC, and Defendant. Defendant issued two CGL Policies ("the

CGL Policies") to Creekstone Builders, a corporation organized under the laws of Texas, covering the period between August 4, 2008, and August 4, 2010. (Dkt. Nos. 145-6; 145-7.) Both Policies included an endorsement listing Creekstone SC, a South Carolina limited liability company, as a named insured, along with other Creekstone entities. (Dkt. Nos. 145-6 at 52; 145-7 at 53.) The Policies' "Separations of Insureds" provision requires that Crum treat its insureds: "(a) As if each Named Insured were the only named insured; and (b) Separately to each insured against whom claim is made or 'suit' is brought." (Dkt. Nos. 145-6 at 18; 145-7 at 18.)

Defendant's "Underwriting Rationale" for the Policies indicates that the Policies "were written with a $50K SIR [self-insured retention] due to past SC, CO Condo operations and $10K for other operations." (Dkt. No. 152-15.) The Policies contain an SIR endorsement, explaining that Defendant's "obligation to pay damages and defend claims or 'suits' under this policy applies only when the amount of the [SIR] has been exhausted by the insured's payment of damages and or 'Claims Expense' that would be covered by this policy but for the application of the [SIR]." (Dkt. Nos. 145-6 at 61; 145-7 at 60.)

The CGL Policies also contain an endorsement entitled "STATE OPERATIONS EXCLUSION":

> It is hereby understood and agreed that this policy does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of "your work" or out of any insured's work, operations or contractual obligations in the following states:
>
> Alaska
> California
> Hawaii
> Nevada
> New York
> Oregon
> South Carolina
> Washington[1]

---

[1] The 2009 CGL Policy adds Colorado as an excluded state.

2

> This exclusion applies regardless of whether such work or operations are
> conducted by the insured or on behalf of the insured or whether the operations are
> conducted for the insured or for others. This exclusion applies to all work and
> operations whether completed or in progress.

(Dkt. Nos. 145-6 at 66; 145-7 at 65.)

On December 13, 2010, the Association filed suit in the underlying action against

Creekstone SC and others, alleging a variety of construction defects in the condominium

buildings managed by the Association. (Dkt. Nos. 11-1 at 1; 27 ¶¶ 1, 2, 10.) The alleged

construction defects occurred between 2004 and 2006 when Creekstone SC performed repairs

and renovations to the condominium buildings located in Mt. Pleasant, South Carolina. (Dkt.

No. 11-2 ¶ 13.)

Defendant issued an initial reservation of rights ("ROR") letter to Creekstone SC on

August 1, 2013. (Dkt. No. 130-2.) The ROR letter cited several exclusions that could

potentially preclude coverage. Defendant concluded that it had "no current duty to defend and/or

indemnify Creekstone SC . . . since no information has been produced to show that the [SIR] has

been exhausted." (*Id.* at 19.) Defendant also stated that its actions should "not be construed as

an admission of coverage" and noted that "[t]here may be other . . . exclusions within [the

Policies] that may limit and/or preclude coverage which might become apparent as this matter

continues." (*Id.*)  In a second ROR letter to Creekstone SC dated March 28, 2014, Defendant

reiterated its position that it "has no duty to respond until the $50,000 per occurrence SIR has

been exhausted . . . ." (Dkt. No. 132-5 at 3.) Defendant stated that if Creekstone SC could

provide "evidence that these conditions have been satisfied, then [Defendant] will re-evaluate its

coverage position." (*Id.*) On April 10, 2014, Defendant informed Creekstone SC that it "owes

no coverage to Creekstone for the Lawsuit under the Policies pursuant to the 2008 and 2009 Policies' State Operations Exclusions." (Dkt. No. 132-10 at 2.)

A jury trial was held to resolve the underlying action in the Charleston County Court of Common Pleas from May 27, 2014, through June 5, 2014. (Dkt. No. 38 ¶ 10.) Prior to trial, mediations were held in October 2013 and March 2014. (Dkt. Nos. 153-17 at 17; 91-4 at 33.) Defendant did not attend either mediation. (Dkt. No. 91-4 at 33.) During the second week of trial, the primary carriers for the various defendants began to "settle out" and tendered the defense to an excess carrier, Ohio Casualty. (Dkt. No. 127-14 at 3.) On the last day of trial, Ohio Casualty also "settled out." (*Id.*) According to Defendant, "the settlement was structured in a way to protect the owners of the various Creekstone entities and all Creekstone entities that had any assets from ever having any liability to the [Association]." (Dkt. No. 144 at 8.) Defendant also contends that Ohio Casualty's settlement was contingent on Creekstone SC's defense attorney, Robert Lyles, "not doing [his] closing" argument. (*Id.* at 5.)

After this settlement, only three defendants remained: Creekstone SC, Creekstone Management, and East Bridge Lofts. (Dkt. No. 127-15 at 4–5.) The lawyers for these entities, including Lyles, then moved to withdraw because they had "no more carrier employer" because the carriers "have settled out" and "nobody is paying [us] anymore." (*Id.*) It appears that no closing argument was made for the three remaining defendants. The jury returned a verdict for the Association in the amount of $55,000,000.00. The Association was also awarded attorney fees and costs in the amount of $3,358,616.00.

In this action, Plaintiffs seek declaratory relief against Defendant in connection with its determination that it is not obligated to indemnify Creekstone SC for the $ 55,000,000.00

4

judgment against it. (Dkt. No. 27 ¶¶ 17–25.) Creekstone SC and Creekstone Builders, Inc. also

bring claims for bad faith, breach of contract, and reformation. (*Id.* ¶¶ 26–45.)

## II. LEGAL STANDARD

Summary judgment is appropriate if a party shows "that there is no genuine dispute as to

any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). In other words, summary judgment should be granted "only when it is clear that there is

no dispute concerning either the facts of the controversy or the inferences to be drawn from those

facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining

whether a genuine issue has been raised, the court must construe all inferences and ambiguities

in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d

1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of

demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has made this threshold demonstration, the non-moving party, to

survive the motion for summary judgment, may not rest on the allegations averred in his or her

pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material

facts exist that give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative

allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving

party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting

*Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

## III. DISCUSSION

Plaintiffs first argue that Creekstone SC is entitled to coverage under the CGL Policies as

a matter of law. (Dkt. No. 130-1 at 3.) Creekstone SC separately argues that it is entitled to

5

summary judgment on its breach of contract and bad faith claims. (Dkt. Nos. 128-1 at 2; 129-1 at 1.) Defendant asserts that it is entitled to summary judgment on Plaintiffs' declaratory judgment claim, as well as the claims for breach of contract and bad faith. (Dkt. No. 125 at 1.) The parties also disagree as to whether Texas law or South Carolina law governs this action. (Dkt. Nos. 125 at 3–5; 130-1 at 5–6.) The Court will address the choice of law issue before discussing the various claims.

### A.    Choice of Law

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. (Dkt. No. 27 at ¶ 8.) In a diversity case, a federal court must apply the choice of law rules of the state in which it is located. *See Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). South Carolina choice of law encompasses both the traditional *lex loci contractus* doctrine and S.C. Code Ann. § 38-61-10. *Okatie Hotel Grp., LLC v. Amerisure Ins. Co.*, No. 2:04-2212-23, 2006 WL 91577, at *2 (D.S.C. Jan. 13, 2006).

Under the rule of *lex loci contractus*, the court is to apply the law of the state where the insurance contract was formed. *Unisun Ins. Co. v. Hertz Rental Corp.*, 436 S.E.2d 182, 184 (S.C. Ct. App. 1993) (holding that a contract for insurance is governed by the law of the state where the application was made, the policy was delivered, and the contract was formed). However, S.C. Code Ann. § 38-61-10, modifies the traditional rule of *lex loci contractus*. This statute provides that

> All contracts of insurance on property, lives, or interests in this State are considered to be made in the state and all contracts of insurance the applications for which are taken within the State are considered to have been made within this State and are subject to the laws of this State.

S.C. Code Ann. § 38-61-10. "Where this statute applies, it governs as South Carolina's rule of conflicts." *Sangamo Weston Inc. v. Nat'l Surety Corp.*, 414 S.E.2d 127, 130 (S.C. 1992)

(applying the statute to an insurance contract executed outside the state between non-resident parties because the insured property at issue was located within the state).

In *Sangamo*, the South Carolina Supreme Court considered the applicability of S.C. Code Ann. § 38-61-10 to insurance policies covering a South Carolina manufacturing facility that had been executed outside of South Carolina by non-citizens of South Carolina. *Id.* In evaluating an insured's declaratory judgment action to determine the scope of insurance coverage, the court had to resolve "which state's law should be applied in interpreting these insurance contracts." *Id.* at 129. Critical to this determination was the fact that the insured "property" at issue— Sangamo's manufacturing facility—was located in South Carolina. *Id.* at 130. According to the court, "[a]lthough the parties are not residents of this state, both parties availed themselves of the law of South Carolina when they respectively provided or received insurance on interests located in this state." *Id.* at 131. Thus, the court reasoned that pursuant to S.C. Code Ann. § 38-61-10, South Carolina law applied. *Id.*

Another court in this district has held that in light of *Sangamo*, the court "must conduct a two-fold analysis to determine what law applies in [an insurance coverage] case." *Okatie,* 2006 WL 91577, at *3. In *Okatie*, the court found that it first "must consider the applicability of § 38-61-10." *Id.* The court noted that Section 38-61-10 was to be read broadly, an interpretation "explicitly embraced" in *Sangamo*. *Id; see also Yeager v. Allstate Ins. Co.*, No. 9:09-860, 2010 WL 680429, at *4 (D.S.C. Feb. 23, 2010) (finding that *Sangamo* requires the court to "interpret § 38–61–10 broadly and determine whether there is a significant connection between the subject of the insurance contract and South Carolina."). If the statute applies, the court must then "address whether South Carolina has sufficient contacts creating a state interest in this dispute so that applying South Carolina's substantive law is consistent with the Full Faith and Credit Clause and

the Due Process Clause." *Id.* Using this analysis, the *Okatie* court found that Section 38-61-10

applied to CGL policies insuring construction of a 66-room hotel in Beaufort, South Carolina,

without offending the Full Faith and Credit Clause or the Due Process Clause. *Id.* at 5.

Turning to the expansive first prong of the *Sangamo* test, the Court notes that Creekstone

SC, the subject of the CGL Policies at issue, is a South Carolina limited liability company. (Dkt.

Nos. 38 ¶ 7); *see Heslin-Kim v. CIGNA Grp. Ins.*, 377 F. Supp. 2d 527, 531 (D.S.C. 2005)

("Pursuant to *Sangamo*, this court's inquiry does not look to where the contract was formed, but

instead focuses on whether the subject of the insurance contract is located in South Carolina.").

Defendant argues that South Carolina is excluded from the scope of the CGL Policies pursuant to

the State Operations Exclusion, and Section § 38-61-10 is therefore inapplicable. (Dkt. No. 125

at 4.) However, the Court finds that such an interpretation is inconsistent with a broad reading of

the statute. As stated in *Sangamo*, "[w]hat is solely relevant [under the statute] is where the

property, lives, or interests insured are located." 414 S.E.2d at 130.

Here, Creekstone SC is a South Carolina entity that performed two construction projects

in South Carolina. After these projects were completed, Creekstone SC did not consider doing

any other projects. (Dkt. No. 143-1 at 8.) Creekstone SC is licensed only in South Carolina as a

general contractor and this license expired in 2008. (Dkt. Nos. 130-5 at 5; 139-3 at 2.) Thus, it

appears that Creekstone SC was created for the sole purpose to perform two discrete construction

projects in South Carolina. "The South Carolina Supreme Court has emphasized that South

Carolina's statutory choice-of-law provision applicable to contracts of insurance on property,

lives, and interests located within the state was intended to further South Carolina's interest in

protecting the rights of its citizens." *Boardman Petroleum, Inc. v. Federated Mutual Ins. Co.*,

135 F.3d 750, 754 (11th Cir. 1998). To find S.C. Code Ann. § 38-61-10 inapplicable here would

run counter to the intent of the South Carolina legislature. Accordingly, the Court finds that in light of Section § 38-61-10 and *Sangamo*, the CGL policies at issue fall under the scope of the South Carolina statute.

The Court further finds that applying Section § 38-61-10 in this matter is not unconstitutional. *Okatie* is instructive here. Similar to *Okatie*, this action likewise involves a claim for coverage under multiple CGL policies for the construction of buildings located in South Carolina. *Id.* at 5; (Dkt. No. 27 at ¶¶ 1, 2, 12.) The *Oaktie* court found that "*Sangamo* and South Carolina's statutory choice-of-law provision applicable to insurance contracts" supported finding the application of South Carolina law constitutional under such facts. *Id.* Here, applying South Carolina substantive law would be "neither arbitrary nor fundamentally unfair" and is consistent with the Full Faith and Credit Clause and the Due Process Clause. *Sangamo*, 414 S.E.2d at 131.

Accordingly, the Court finds that South Carolina substantive law governs this action.[2]

## B.    Coverage

Plaintiffs collectively bring a claim for declaratory judgment, arguing that Creekstone SC is entitled to coverage under the CGL Policies as a matter of law. Plaintiffs first argue that coverage cannot be denied under the State Operations Exclusion because enforcing this exclusion would render coverage to Creekstone SC "illusory." (Dkt. No. 145 at 7–8.)

---

[2] For the majority of issues in this action, South Carolina law and Texas law are no different. There is an actual conflict only for Creekstone SC's bad faith claim. *Compare Cantu v. S. Ins. Co.*, No. 03-14-00533, 2015 WL 5096858, at *8 (Tex. App. Aug. 25, 2015) ("As a general rule, an insured does not have a bad faith claim in the absence of a breach of contract by the insured."), *with Tadlock Painting Co. v. Md. Cas. Co.*, 473 S.E.2d 52, 55 (S.C. 1996) (finding that breach of express contractual provision is not prerequisite to bringing action for breach of implied covenant of good faith and fair dealing for consequential damages allegedly suffered as a result of bad faith).

Specifically, when treating Creekstone SC as the only named insured under the Policies,[3] Plaintiffs contend that applying the State Operations Exclusion "removes all coverage for this 'only' insured." (Dkt. No. 152 at 4.)

Plaintiffs primarily rely on *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318, 321 (S.C. Ct. App. 1994) *writ granted in part, decision aff'd*, 468 S.E.2d 304 (S.C. 1996), to argue that the Court should not enforce the State Operations Exclusion. (Dkt. No. 130-1 at 23.) In *Isle of Palms*, the South Carolina Court of Appeals considered whether the professional liability exclusion contained in a liability insurance policy barred the insured's claim for coverage. 459 S.E.2d at 321. The claim against the insured, a pest control company, arose from a termite inspection. *Id.* The insurer argued that "inspecting homes and issuing termite letters are professional services excluded from coverage, while actual exterminating is not a professional service." *Id.*

The *Isle of Palms* court found no support in the policy or in relevant case law for such "an inspection/extermination distinction," and held that there was "no principled reason" to label these services differently under the professional services exclusion. *Id.* Accordingly, "[t]o give effect to the professional liability exclusion would render the policy virtually meaningless, because it would exclude coverage for all claims arising from [the insured's] exterminating services, the very risk contemplated by the parties." *Id.* The court further found that "[t]he internal inconsistency created by an exclusion which purports to bar coverage for claims arising out of the very operation sought to be insured renders the policy ambiguous, and we must resolve that ambiguity in favor of coverage." *Id.* Plaintiffs argue that this Court should likewise find

---

[3] The Policies' "Separations of Insureds" require that Crum treat its insureds: "(a) As if each Named Insured were the only named insured; and (b) Separately to each insured against whom claim is made or 'suit' is brought." (Dkt. Nos. 145-6 at 18; 145-7 at 18.)

that the State Operations Exclusion creates an internal inconsistency in the CGL Policies, and that the resulting ambiguity mandates that the Court find in favor of coverage.

Plaintiffs also cite *S.C. Farm Bureau Mutual Ins. Co. v. Kennedy*, 730 S.E.2d 862, 867 (S.C. 2012), in which the South Carolina Supreme Court considered whether to award coverage under the provisions of an automobile insurance policy. The court considered the insurer's argument for a literal interpretation of the policy provision in question, noting the Supreme Court of Rhode Island's observation that "the literal interpretation of policy language will be rejected where its application would lead to unreasonable results and the definitions as written would be so narrow as to make coverage merely 'illusory.'" 730 S.E.2d at 867. The court ultimately found that "it would be unreasonable and unconscionable to interpret the provision" at issue in a way that would prevent coverage under the particular facts. *Id.* at 868.

Defendant argues that the "controlling authority" on this issue is *B.L.G. Enterprises, Inc. v. First Financial Ins. Co.*, 514 S.E.2d 327 (S.C. 1999). In *BLG Enterprises*, the court applied a liquor liability exclusion to deny coverage to a bar for negligently serving alcohol to a patron who in turn caused injury to a passenger. 514 S.E.2d at 330–32. The court found that the exclusion did not render the policy illusory, noting that certain coverage "remain[ed] intact." *Id.* at 331. For example, coverage would exist for a patron who slipped and fell at the bar. *Id.* The court also noted that liquor liability exclusions "have been uniformly found unambiguous and upheld in numerous jurisdictions." *Id.* (collecting cases). The court concluded that "the language in the policy clearly and unambiguously reflects" the liquor liability exclusion and the exclusion should therefore be enforced. *Id.* Defendant argues that applying the State Operations Exclusion in the instant action similarly does not render the Policies illusory because Creekstone SC could still receive coverage. According to Defendant, coverage would not be precluded

11

under the State Operations Exclusion had Creekstone SC "done business in Georgia, North Carolina, or forty other states." (Dkt. No. 125 at 19.)

Here, the Court finds that applying the State Operation Exclusion to Creekstone SC would render coverage illusory under the CGL Policies. As previously noted, Creekstone SC is a South Carolina entity that was only licensed to perform general contractor work in South Carolina. (Dkt. Nos. 130-5 at 5; 139-3 at 2; 143-1 at 8.) It completed two construction projects in South Carolina before allowing its license to expire. (Dkt. Nos. 130-5 at 5; 139-3 at 2; 143-1 at 8.) Thus, the only claims Creekstone SC could make under the Policies would be for work performed in South Carolina.

Although Defendant argues that coverage would exist if Creekstone SC performed work in states not excluded under the State Operations Exclusion, this theoretical argument is without merit. As its name indicates, Creekstone SC was created to perform work in South Carolina. Further, it appears that Defendant took Creekstone SC's past work in South Carolina into consideration when underwriting the Policies. Indeed, the "Underwriting Rationale" for the Policies states that the Policies "were written with a $50K SIR due to past SC, CO Condo operations and $10K for other operations." (Dkt. No. 152-15.) This supports finding that the operations Creekstone SC sought to be insured were those in South Carolina.

Defendant also makes much of the fact that Creekstone SC was dormant at the time it became insured under the Policies. (Dkt. Nos. 125 at 16; 126-3 at 4.) However, even if Creekstone never became active again, it would still be subject to claims for past work performed in South Carolina. This would create a need for coverage and is exactly what occurred in the instant action.

Accordingly, as in *Isle of Palms*, the Court finds that the State Operations Exclusion creates an internal inconsistency in the Policies because it "purports to bar coverage for claims arising out of the very operation[s] sought to be insured." 459 S.E.2d at 321. This internal inconsistency renders the Policies ambiguous, and the Court "must resolve that ambiguity in favor of coverage." *Id.*; *see also W. World Ins. Co. v. Empire Fire & Marine Ins. Co.*, No. 7:06-cv-217, 2006 WL 3337427, at *7 (D.S.C. Nov. 16, 2006) ("The internal inconsistency created by an exclusion which purports to bar coverage for claims arising out of the very operation sought to be insured renders the policy ambiguous, and we must resolve that ambiguity in favor of coverage."). Having found that coverage exists under the CGL Policies on this ground, the Court will not consider Plaintiffs' other arguments for coverage.[4]

### C.    Breach of Contract

Creekstone SC contends that Defendant breached the CGL Policies as a matter of law by: (1) denying coverage under the State Operations Exclusion; (2) failing to treat Creekstone SC as the only insured; (3) insisting that Creekstone SC pay the SIR in violation of the SIR endorsement's bankruptcy provision; (4) disregarding the putative underlying class action that was brought separately from the Association's underlying lawsuit; and (5) relying on an ambiguous SIR provision "to avoid its obligations." (Dkt. Nos. 129-1 at 5; 153 at 12–14.) To establish breach of contract under South Carolina law, Creekstone SC must prove the existence of a contract, its breach, and the damages caused by such breach. *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. Ct. App. 2009) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962)).

---

[4] This includes the reformation claim, in which Creekstone SC again seeks to establish coverage under the CGL Policies. (Dkt. No. 27 ¶¶ 34–45.)

### 1. Denying Coverage under the State Operations Exclusion

For reasons already stated, the Court finds that Creekstone SC is entitled to coverage under the CGL Policies and that Defendant breached the CGL Policies by failing to indemnify Creekstone SC. Accordingly, Defendant must pay the policy limits in the aggregate amount of $2 million dollars. Creekstone SC alleges that Defendant's denial of coverage caused the $55 million dollar judgment constituting damages for the breach of contact. Defendant, however, alleges that the $55 million dollar judgment in the underlying action was the result of "a rigged trial and collusive settlement." (Dkt. No. 144 at 8.) To the extent Defendant alleges that Creekstone SC would not have incurred a $55 million dollar judgment but for the "collusive settlement," it is a jury question whether Defendant must pay damages beyond the policy limits.

### 2. Failure to Treat Creekstone SC as Separate Insured

Creekstone SC asserts that Defendant also breached the CGL Policies by ignoring the the "Separation of Insureds" provision. This provision requires that Defendant treat Creekstone SC as if it were the only named insured. To establish this breach, Creekstone SC first points to deposition testimony from Defendant's former claims adjuster, Joseph Malfara, stating that he did not think Creekstone SC "was treated as if it was the only insured under the SIR." (Dkt. No. 145-15 at 28.) Creekstone SC contends that this "concession, alone, entitles Creekstone SC [to] summary judgment on its breach of contract claim" because Defendant's breach "ultimately exposed Creekstone SC to the multi-million dollar judgment entered in the Underlying Action." (Dkt. No. 153 at 6.) However, Creekstone SC does not provide any detail as to how Defendant's failure to adhere to the "Separation of Insureds" provision in and of itself damaged Creekstone SC. Creekstone SC expands on this claim when arguing that Defendant breached the SIR bankruptcy provision and the Court will address it further below.

14

### 3.     Violation of SIR Bankruptcy Provision

Under the CGL Policies, the SIR endorsement's bankruptcy provision provides that

> Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Commercial General Liability Coverage Part; however, coverage will apply only to covered liability in excess of the Self Insured Retention. In the event the insured is unable to pay the Self-Insured Retention for any reason including bankruptcy, insolvency or any other financial impairment, this policy will apply as though the Self-Insured Retention were available and collectible.

(Dkt. Nos. 145-6 at 64; 145-7 at 63.)  The CGL Policies do not define the terms "bankruptcy," "insolvency," or "financial impairment."

Creekstone SC argues that it was insolvent at the time it made its claim under the CGL Policies and that as the "only insured," it should not have had to pay the SIR. (Dkt. No. 153 at 6.) Creekstone SC contends that Defendant was aware of Creekstone SC's "insolvency" and breached the bankruptcy provision by demanding payment of the SIR rather than waiving this payment and immediately participating in the defense of Creekstone SC. (Dkt. Nos. 129-1 at 3; 153 at 6–8.) Creekstone SC further contends that Defendant intentionally omitted any reference to the bankruptcy provision in every letter it sent to Creekstone SC. (Dkt. No. 153 at 6–7.) Defendant responds that it had no knowledge of Creekstone SC's financial condition during the underlying litigation. (Dkt. No. 141 at 7.) It also contends that Creekstone SC had possession of the CGL Policies "since 2008" and therefore should have known of the SIR bankruptcy provision. (*Id.* at 8.)

Creekstone SC asserts that Defendant knew of its insolvency because: (1) Defendant knew that Creekstone SC was "dormant" at the time Defendant issued the CGL Policies; (2) Defendant's "underwriting file evidenced Creekstone SC lacked assets, employees, and even a bank account"; and (3) Defendant is presumed to know of Creekstone SC's financial impairment

15

according to South Carolina law. (Dkt. No. 153 at 6–7 n.9.) The Court finds these arguments unconvincing. First, an insured's "dormant" status, by itself, does not necessarily indicate "insolvency." Further, the fact that Creekstone SC lacked assets, employees, and a bank when it applied for insurance would not necessarily indicate anything about its financial status at the time its claim for coverage arose years later. Finally, Creekstone SC misunderstands South Carolina law when it argues that Defendant should have known of its financial impairment. While it is true that "[i]nsurance companies . . . are . . . presumed to know what facts and circumstances are material to the risk offered," Creekstone's potential insolvency would not be material to the risk it offered to the insurer under the CGL policy. *Graham v. Am. Fire Ins. Co. of Philadelphia*, 26 S.E. 323, 334 (S.C. 1897).

The Court cannot find any South Carolina law that imposes a legal duty on an insurer to investigate the solvency of its insured under these facts. Even when drawing all inferences in Creekstone SC's favor, no reasonable jury could find that Defendant was aware of Creekstone SC's "financial impairment" when it communicated with Creekstone SC regarding the underlying litigation. Further, it is confusing for Creekstone SC to assert that Defendant should have been aware of Creekstone SC's "insolvency" when it also contends that Defendant "ignore[d] its insureds' multiple communications that the SIR was both actually and 'imminently' exhausted." (Dkt. No. 153 at 11 n.14.)

Accordingly, the Court finds that Defendant did not breach the CGL Policies by failing to waive the SIR payment under the bankruptcy provision.

### 4.    Ignoring Underlying Class Action

Creekstone SC also asserts that Defendant breached the CGL Policies by failing "to make any effort to acknowledge, investigate, reserve rights, [or] accept or deny the claims" presented

16

in the putative underlying class action that was brought separately from the Association's underlying lawsuit. (Dkt. No. 143 at 12–13.) This putative class action, *Hayden Jeffords, et al. v. East Bridge Town Lofts, LLC et al.*, 2010-CP-10-9672 (Charleston, S.C., Ct. Common Pleas, November 19, 2010), was filed in the Charleston County Court of Common Pleas in 2010. On January 11, 2012, the trial court combined the Jeffords suit with the Association's lawsuit "for Discovery Purposes ONLY." (Dkt. No. 156-1.) The trial court then decided on October 5, 2012, that the Association was "the proper party to pursue claims relating to the East Bridge properties it maintains" and dismissed the *Jeffords* suit. (Dkt. No. 156-3 at 12.) The *Jeffords* Plaintiffs appealed the dismissal of their claims and the Association's suit was stayed pending resolution of the appeal. (Dkt. No. 156-4 at 7.) On July 17, 2013, Creekstone SC sent a formal tender letter to Defendant stating that its "insureds are the subject of a lawsuit relevant to the development, construction, and sale of the Project. . . . I am hereby placing you on notice of this claim." (Dkt. No. 156-2 at 1.) The letter provided the case names and civil action numbers for both the Association's suit and the *Jeffords* suit. (*Id.*) On August 1, 2013, Defendant issued its first reservation of rights letter acknowledging receipt of the formal tender letter and disclaiming coverage. (Dkt. No. 127-1 at 1.) Defendant referenced only the Association's lawsuit in its letter. (*Id.* at 2.) On October 7, 2014, the South Carolina Court of Appeals dismissed the *Jeffords* appeal as moot.

Creekstone SC asserts that Defendant's "failure to acknowledge Creekstone SC in the *Jeffords* suit is an uncontroverted breach of the insurance agreement between [Defendant] and Creekstone SC." (Dkt. No. 153 at 14.) Creekstone SC further contends that *Jeffords* lawsuit "eventually[] became part of the $55 million dollar judgment against Creekstone SC." (*Id.* at 13.) Defendant, however, argues that there can be no breach of contract for any alleged lack of

inquiry into the *Jeffords* suit because this suit was dismissed before it was brought to Defendant's attention. (*Id.* at 3.) Defendant also contends that the claims in the *Jeffords* suit were not merged with those in the Association's lawsuit and have no connection to the judgment awarded in that lawsuit. (*Id.* at 5.) Finally, Defendant notes that Creekstone SC attached only the Second Amended Petition in the Association's suit to its formal tender letter and did not include any pleadings from the *Jeffords* suit. (Dkt. No. 156 at 2.)

Here, the Court agrees with Defendant that Creekstone SC has not submitted evidence that the *Jeffords* suit became part of the judgment awarded in the Association's lawsuit. According to the record before the Court, it is undisputed that the *Jeffords* suit was dismissed and the trial court specifically denied the motion to consolidate the *Jeffords* suit with the Association's lawsuit, finding the motion to be moot. (Dkt. No. 156-3 at 12–13.) There is no evidence that the claims in the two suits were ever combined for adjudication. Also, because the *Jeffords* suit was dismissed prior to Defendant's notice of the potential claims against Creekstone SC, any investigation into this action would have been pointless. There is no genuine issue of material fact that Creekstone SC was not damaged by Defendant's alleged failure to investigate the claims in the *Jeffords* suit. Further, Creekstone SC's formal tender letter represented that Creekstone SC was the subject of "*a* lawsuit," and put Defendant on notice of "*this* claim." (Dkt. No. 156-2 at 1) (emphasis added). This indicates that at the time Creekstone SC tendered notice, it believed that Defendant did not need to separately investigate the claims asserted in the *Jeffords* suit and the Association's lawsuit.

Accordingly, the Court finds that Creekstone SC cannot establish a breach of contract claim on this basis and grants Defendant's motion for summary judgment on this issue.

### 5.    Ambiguous SIR Endorsement

Creekstone SC also claims that Defendant's "reliance on the SIR Endorsement, as a whole, also constitutes a breach . . . given the SIR Endorsement provision is ambiguous, as written, and never satisfiable under [Defendant's] interpretation." (Dkt. No. 153 at 8.) Creekstone SC cites deposition testimony from one of Defendant's experts, Thomas Hesse ("Hesse"), which is helpful in discerning its claim of ambiguity. Hesse testified that the SIR provision "seem[s] to be" conflicting because "one [paragraph] says that [the SIR] can be exhausted by the insureds' payment of damages and/or claim expense . . . And the other one says the [SIR] can only be reduced or exhausted by your payment of settlements or judgments for damages." (Dkt. No. 140-2 at 2.) Hesse agreed that resolving this "ambiguity" in the insured's favor indicated that "the payment of claim expenses would satisfy the SIR." (*Id.*) Creekstone SC alleges that it paid "thousands in SIR-related expenses and contributions." (Dkt. No. 153 at 8.)

Here, Creekstone SC has failed to show how the alleged ambiguity of the SIR provision caused it harm. Creekstone SC alleges that it paid the SIR; therefore, it was able to resolve any ambiguity on its own. Accordingly, the Court finds that Creekstone SC cannot establish a breach of contract on this basis. However, the Court will explore Defendant's actions regarding the SIR provision in more detail below, in the context of Creekstone SC's bad faith claim.

### D.    Bad Faith

Creekstone SC argues that it is entitled to summary judgment on its bad faith claim, alleging that Defendant's actions in both "handling" Creekstone SC's claim for coverage and in later denying the claim constituted bad faith. (Dkt. No. 128-1 at 4.) Creekstone SC further alleges that Defendant's failure to settle the underlying claims on its behalf constituted bad faith.

19

(*Id.* at 29.) Defendant, however, disputes many of the facts underlying the bad faith claim, and contends that Creekstone SC "cannot recover the amount of the underlying judgment as a matter of law." (Dkt. No. 144 at 1.) Defendant also argues that there can be no bad faith claim for denial of coverage in this context, where the insured makes a claim under a CGL policy. (Dkt. No. 144 at 12–13.) Finally, Defendant contends that it had no duty to settle because it did not assume Creekstone SC's defense in the underlying action. (*Id.* at 14–15.) The Court will address these arguments in turn.

### 1.    Denial of Coverage

Defendant first contends that South Carolina law does not allow an insured to bring a bad faith claim for denying coverage under a CGL policy. (Dkt. No. 144 at 12–13.) However, Defendant provides no authority for this proposition and cites two cases in which the court actually considered the bad faith claim on the merits. *See MCE Auto., Inc. v. Nat'l Cas. Co.*, No. 6:11-cv-1245, 2012 WL 4479163, at *6 (D.S.C. Sept. 28, 2012) aff'd, 535 F. App'x 303 (4th Cir. 2013) (no bad faith liability because insurer had reasonable basis to contest coverage); *S. Land & Golf Co. v. Harleysville Mut. Ins. Co.*, No. 2:03-cv-2189, 2006 WL 2443340, at *4 (D.S.C. Aug. 22, 2006) (no bad faith liability because no benefits due under contract). Because there is no authority stating that the standard for asserting a bad faith claim is different in the CGL policy context, the Court will address the merits of this claim.

A party claiming bad faith denial of coverage must demonstrate:

(1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

*Cock-N-Bull Steak House, Inc. v. Generali Ins. Co.*, 466 S.E.2d 727, 730 (S.C. 1996).

Creekstone SC alleges that Defendant misrepresented that the CGL Policies provided coverage and then later denied coverage "based upon an exclusion [Defendant] never articulated until being used as the sole basis for its denial." (Dkt. No. 128-1 at 23.) Defendant asserts that its reliance on the State Operations Exclusion to deny coverage was reasonable and did not constitute bad faith. (Dkt. No. 144 at 14.) Here, the Court has found that applying the State Operations Exclusion to Creekstone SC would render coverage illusory because it would deny coverage for the claims arising out of the very operations sought to be insured. Specifically, Creekstone SC is a South Carolina entity that completed two construction projects in South Carolina before allowing its general contractor license to expire, and it sought coverage for claims arising out of one of these projects. (Dkt. Nos. 130-5 at 5; 139-3 at 2; 143-1 at 8.) However, a jury could conclude that Defendant's decision to deny coverage was reasonable. For example, reasonable minds could disagree as to whether Defendant had sufficient information about Creekstone SC's operations in South Carolina at the time it denied coverage.

Whether Defendant's decision to deny coverage was reasonable is ultimately a question of fact for the jury. *See* 14 Couch on Ins. § 204:43 ("Bad faith . . . is generally left as a question of fact for the jury."). Accordingly, the Court will not grant either party's motion for summary judgment on this ground.

### 2.    Failure to Settle

Defendant next asserts that it did not have a duty to settle any claims in the underlying action as a matter of law because it never assumed the defense of Creekstone SC. (Dkt. No. 144 at 14–15.) Defendant relies on *Miles v. State Farm Mut. Auto Ins. Co.*, 120 S.E.2d 217 (S.C. 1961), for this proposition. In *Miles*, the court held that when an insurer is defending a claim brought against its insured, unreasonable refusal on the insurer's part to accept an offer of

compromise settlement will render it liable in tort to the insured for the amount of the judgment against the insured in excess of policy limits. 120 S.E.2d at 220 (citing *Tyger River Pine Co. v. Md. Cas. Co.*, 170 S.E. 346 (1933)). The *Miles* court found that the insurer in that case did not have a duty to accept a reasonable offer of settlement because it "never assumed or undertook to control the defense of [the insured] or to determine whether or not a compromise settlement . . . should be made." *Id.*

Here, as in *Miles*, it is undisputed that Defendant never assumed the defense of Creekstone SC. Accordingly, Defendant cannot be found liable for failing to settle any claims against Creekstone SC under South Carolina law. *Cf. Snyder v. State Farm Mut. Auto. Ins. Co.*, 586 F. Supp. 2d 453, 459 (D.S.C. 2008) ("One situation in which South Carolina law does impose a duty to settle is in a liability case in which the insurer assumes the defense of the insured and the insured may potentially be exposed to liability above and beyond the policy limits.").

### 3.    Handling of Claim

Defendant also argues that it did not act in bad faith when "handling" Creekstone SC's claim for coverage. (Dkt. No. 144 at 18.) "Bad faith is a knowing failure on the part of the insurer to exercise an honest and informed judgment in processing a claim." 16A Appleman, Insurance Law and Practice Compensatory and Punitive Damages § 8878.25 (1981). "Under South Carolina law, an insurer acts in bad faith where there is no reasonable basis to support the insurer's decision." *Cock-N-Bull*, 466 S.E.2d at 730.

Here, Defendant largely disputes the underlying facts supporting the bad faith allegations and Creekstone SC's interpretation of those facts. For example, Creekstone SC alleges that Defendant denied coverage after Defendant "knew exhaustion of the SIR was 'imminent,' . . .

22

after Creekstone SC incurred tens of thousands of dollars in claim related expenses; and after

Creekstone had tendered $100,000 to satisfy the SIR for both [CGL] [P]olicies." (Dkt. No. 128-

1 at 24 n.8.)  Defendant, however, contends that Creekstone SC has no "competent evidence" to

support these assertions.  Stephen Keller ("Keller") and Everett Jackson ("Jackson"), the co-

owners of Creekstone, testified in depositions that they paid $100,000 to satisfy the SIR.  (Dkt.

Nos. 144-1 at 10–11; 144-2 at 2.)  They do not remember who they paid the money to, however.

(Dkt. No. 144-1 at 10; 144-2 at 2.)  Lyles, Creekstone SC's defense counsel in the underlying

action, has testified that he does not "remember [Keller and Jackson] paying [his] legal bills."

(Dkt. No. 144-4 at 6.)  Defendant contends that Creekstone SC "has never produced a cancelled

check, a wire transfer record, or any other evidence showing such a payment." (Dkt. No. 144 at

19.)  Such a factual dispute is for the jury to resolve; further, it is for the jury to decide whether it

was reasonable for Defendant to deny coverage after the SIR was allegedly paid.

Creekstone SC also alleges that Defendant "materially omitted the true basis of [its]

ultimate coverage position" by failing to mention the State Operations Exclusion in its first or

second reservation of rights letters.   (Dk. No. 128-1 at 24.)  Creekstone SC points to Hesse's

deposition testimony to support the assertion that this omission was an error constituting bad

faith.  (*Id.*)  Defendant argues that this omission was "simply a mistake because the [State

Operations Exclusion] was overlooked by the adjuster that prepared the [reservation of rights]

letter." (Dkt. No. 144 at 20.)  Defendant also argues that Hesse did not testify that Defendant

acted in bad faith, rather he "agreed to certain general standards concerning how an insurer

should handle a claim." (*Id.* at 18 n.6.)  The parties are both referring to Hesse's testimony that

"it was an oversight or an error that the [State Operations Exclusion] was not referred to in the

reservation of rights letter." (Dkt. No. 139-4 at 16.)  They essentially ask the court to interpret

Hesse's testimony and determine the reasonableness of Defendant's omission, both of which are better suited for the jury to decide. The Court finds that reasonable minds could differ as to these issues.

Creekstone SC further alleges that Defendant ignored communications from "its insureds, their defense counsel as well as other carriers regarding its coverage position and involvement in the March [2014] Mediation." (Dkt. No. 128-1 at 27.) Keller, for example, sent an email to Defendant regarding Defendant's refusal "to negotiate a resolution of [the underlying action] within its policy limits." (Dkt. No. 94-5.) Keller stated that "it is utterly ridiculous" for Defendant to rely on the payment of the SIR as the basis for its refusal and asked that Defendant "set forth the basis" of its refusal to participate in settlement discussions. (*Id.*) Creekstone SC alleges that Defendant did not respond to Keller's demand and, instead, Defendant's coverage counsel sent a second reservation of rights letter. (Dkt. Nos. 128-1 at 28; 127-3.) Defendant asserts that this reservation of rights letter was an appropriate response to Keller's demand and does not constitute bad faith. (Dkt. No. 144 at 22.) Again, reasonable minds could disagree as to whether Defendant reasonably responded to its insured's request for explanation.

Accordingly, the Court finds that it is a question of fact as to whether Defendant acted unreasonably when handling Creekstone SC's claim for coverage. *See* 14 Couch on Ins. § 204:43 ("Bad faith . . . is generally left as a question of fact for the jury.").

### 4.    Investigation of Claim

Defendant also disputes Creekstone SC's allegation that Defendant failed to conduct a reasonable claims investigation. (Dkt. No. 128-1 at 31.) Under South Carolina law, "[a]n insurer has a good faith duty to investigate a claim." *Flynn v. Nationwide Mut. Ins. Co.*, 315 S.E.2d 817, 820 (S.C. Ct. App. 1984). In *Trimper v. Nationwide Ins. Co.*, the court found that

the jury properly awarded punitive damages based on the insurer's complete lack of effort to investigate the insured's claim. 540 F. Supp. 1188, 1194 (D.S.C. 1982). Creekstone SC argues that, as in *Trimper*, Defendant failed to properly investigate the claim against its insured. (Dkt. No. 128-1 at 31.) Specifically, Creekstone SC alleges that Defendant failed to perform any investigation until ten months after receiving notice of the claim, and then limited its investigation to "waiting for confirmation that the insured has satisfied the SIR." (Dkt. No. 128-1 at 31.)

Defendant asserts that it is undisputed that the claim against Creekstone SC arose out of a construction project in South Carolina, and that no other information was needed to determine coverage in light of the State Operations Exclusion. (Dkt. No. 144 at 25.) According to Defendant, "no other fact [] is necessary to establish a reasonable basis for denial of the claim." (*Id.*) Defendant further argues that *Trimper* is inapplicable because the case involved a first-party claim. (Dkt. No. 144 at 25.) However, as previously stated, the court finds no authority for the proposition that South Carolina law differs when a bad faith claim arises under a CGL policy. Defendant provides no evidence that it investigated Creekstone SC's claim and its own expert testified that Defendant did not conduct any investigation other than "waiting for confirmation that the insured has satisfied the [SIR]." (Dkt. No. 140-1 at 22.)

Because there is no evidence that Defendant investigated Creekstone SC's claim, the Court finds that Defendant did not carry out its good faith duty to investigate. However, Creekstone SC still cannot establish bad faith as a matter of law. As explained below, there is an issue of fact as to whether Defendant's alleged bad faith proximately caused the damages claimed by Creekstone SC, specifically the underlying judgment.

### 4.    Causation and Alleged Collusion

According to Defendant, Creekstone SC cannot establish a causal connection between Defendant's alleged bad faith and the underlying judgment, and, regardless, the underlying judgment cannot be enforced. (Dkt. No. 144 at 17, 27.) Specifically, Defendant asserts that the underlying judgment was the result of Creekstone SC's "terrible job of converting the East Bridge Lofts from apartments to condominiums" and had nothing to do with Defendant's actions or inactions. (*Id.* at 17.) Defendant further asserts that the underlying judgment "is a collusive sham fabricated solely to try to create a false bad faith claim against [Defendant] in an effort to punish [Defendant] for not contributing to the settlement of the [Association's] claim." (*Id.* at 27.) Creekstone SC does not address the allegations of collusion, but contends that the underlying judgment is one of the "resulting consequences" of Defendant's alleged bad faith. (Dkt. No. 151 at 7.)

The Court finds that Defendant's allegations of collusion and lack of causation present an issue of fact that precludes awarding summary judgment to either party. Accordingly, Creekstone SC's allegations of bad faith denial of coverage, bad faith "handling" of its claim, and bad faith investigation of its claim may proceed. However, Creekstone SC's allegation of bad faith failure to settle is dismissed.

## IV. CONCLUSION

For the reasons stated herein, the Court finds that Creekstone SC is entitled to coverage under the CGL Policies, and that Defendant improperly breached the CGL Policies by denying coverage under the State Operations Exclusion. However, it is an issue of fact as to whether this breach caused the $55 million dollar judgment in the underlying action. FRCP 56(d). The Court further finds that genuine issues of material fact exist regarding Creekstone SC's bad faith claim.

Accordingly, the Court **GRANTS** Plaintiffs' motion for summary judgment on the declaratory judgment claim (Dkt. No. 130-1); **GRANTS IN PART** and **DENIES IN PART** Creekstone SC's motion for summary judgment on its breach of contract claim (Dkt. No. 129-1), and **DENIES** Creekstone SC's motion for summary judgment on its bad faith claim (Dkt. No. 128-1). The Court further **DENIES IN PART** and **GRANTS IN PART** Defendant's motion for summary judgment (Dkt. No. 125).

      **IT IS SO ORDERED**.

Richard M. Gergel
United States District Judge

November 2, 2015
Charleston, South Carolina